**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| RCS CREDITOR TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2017-0178-SG |
| | ) | |
| NICHOLAS S. SCHORSCH, EDWARD | ) | |
| M. WEIL, JR., WILLIAM KAHANE, | ) | |
| PETER M. BUDKO, BRIAN S. | ) | |
| BLOCK, LOUISA QUARTO, RCAP | ) | |
| HOLDINGS LLC, AR CAPITAL, LLC, | ) | |
| AR GLOBAL INVESTMENTS, LLC, | ) | |
| AMERICAN REALTY CAPITAL | ) | |
| RETAIL ADVISOR, LLC, AMERICAN | ) | |
| FINANCE ADVISORS, LLC, | ) | |
| AMERICAN REALTY CAPITAL | ) | |
| HEALTHCARE III ADVISORS, LLC, | ) | |
| AMERICAN REALTY CAPITAL | ) | |
| HOSPITALITY ADVISORS, LLC, | ) | |
| NEW YORK CITY ADVISORS, LLC, | ) | |
| GLOBAL NET LEASE ADVISORS, | ) | |
| LLC, AMERICAN REALTY CAPITAL | ) | |
| HEALTHCARE II ADVISORS, LLC, | ) | |
| NEW YORK RECOVERY ADVISORS, | ) | |
| LLC, and BDCA ADVISER, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Date Submitted:  September 29, 2017
Date Decided:  November 30, 2017

Philip Trainer, Jr. and Marie M. Degnan, of ASHBY & GEDDES, Wilmington, Delaware; OF COUNSEL: John P. Coffey, Gregory A. Horowitz, Jeffrey S. Trachtman, Eileen Patt, and Jeffrey Dunlap, of KRAMER LEVIN NAFTALIS & FRANKEL, New York, New York, *Attorneys for Plaintiff*.

Stephen P. Lamb and Meghan M. Dougherty, of PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, Wilmington, Delaware; OF COUNSEL: Allan J. Arffa, Gregory F. Laufer, and Jeremy A. Benjamin, of PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, New York, New York, *Attorneys for Defendants Nicholas S. Schorsch, Edward M. Weil, Jr., William Kahane, Peter M. Budko, Louisa Quarto, RCAP Holdings LLC, AR Capital, LLC, AR Global Investments, LLC, American Realty Capital Retail Advisor, LLC, American Finance Advisors, LLC, American Realty Capital Healthcare III Advisors, LLC, American Realty Capital Hospitality Advisors, LLC, New York City Advisors, LLC, Global Net Lease Advisors, LLC, American Realty Capital Healthcare II Advisors, LLC, New York Recovery Advisors, LLC, and BDCA Adviser, LLC*.

Elizabeth A. Sloan, of BALLARD SPAHR LLP, Wilmington, Delaware; OF COUNSEL: Michael C. Miller and Michael G. Scavelli, of STEPTOE & JOHNSON LLP, New York, New York; Lara E. Romansic, of STEPTOE & JOHNSON LLP, Washington, DC, *Attorneys for Defendant Brian S. Block*.

GLASSCOCK, Vice Chancellor

This matter involves real estate investment trusts—REITs—and the reader will find that here, as is common in the REIT industry, the business structure described comprises a confusing blizzard of entities, making the structure difficult to comprehend without weary effort. The Plaintiff's contentions are simple enough, however. Certain of the Defendants created an entity, AR Capital LLC, to develop and manage REITs. They formed another entity, RCS Capital Corporation ("RCAP"), which, through subsidiaries, was responsible for marketing and distributing, and providing other services, in connection with AR Capital investment products. These Defendants owned 100% of AR Capital, but took RCAP public, retaining only a minority interest in RCAP. Through retention of a single share of super-voting common stock, however, they ensured that they retained control of RCAP. Thereafter, they structured operation of the entities in a way that maximized profits at AR Capital, and that assigned expenses to RCAP, to the detriment of the non-controlling stockholders of that entity.

According to the Plaintiff, these Defendants, as controllers, directors, or officers of RCAP, owed fiduciary duties to the non-controlling stockholders of RCAP, which duties they have breached, aided and abetted by an entity they controlled and an officer of one of RCAP's subsidiaries. The Defendants have moved to dismiss several, but not all, causes of action in the Complaint. For the reasons that follow, the Defendants' Motions are granted in part and denied in part.

1

# I. BACKGROUND[1]

*A. The Parties and Relevant Non-Parties*

### 1. Entities

Plaintiff RCS Creditor Trust was formed as part of the joint Chapter 11 reorganization plan for RCAP and affiliated entities.[2] The plan assigned the Plaintiff certain causes of action belonging to RCAP's debtors, "including those asserted in this action."[3]

RCAP was a Delaware corporation that maintained its principal place of business in New York City.[4] RCAP was incorporated in December 2012, and it served as a holding company for several businesses, including a wholesale broker-dealer known as Realty Capital Securities ("RCS") and an investment bank.[5] RCAP went public on June 5, 2013, and filed for Chapter 11 bankruptcy on January 31, 2016.[6]

Defendant RCAP Holdings LLC ("Holdings") is a Delaware limited liability company whose principal place of business is in New York City.[7] Holdings' primary

---

[1] The facts, drawn from the Plaintiff's Complaint, from documents incorporated by reference therein, and from matters of which I may take judicial notice, are presumed true for purposes of evaluating the Defendants' Motions to Dismiss. I recite only those facts necessary to decide those Motions.

[2] Compl. ¶ 14.

[3] *Id.*

[4] *Id.* ¶ 15.

[5] *Id.* ¶¶ 15, 31.

[6] *Id.* ¶ 15.

[7] *Id.* ¶ 16.

asset was the sole outstanding share of RCAP's Class B common stock, "which had the same economic rights as a share of Class A common stock but voted as 50% plus one vote of the outstanding common stock of [RCAP]."[8]

Defendant AR Capital LLC is a Delaware limited liability company with a principal place of business in New York City.[9] AR Capital creates and manages non-traded investment vehicles, primarily REITs.[10] "AR Capital is the largest creator and sponsor of REITs in the United States."[11] Its non-traded REIT offerings include "healthcare, hospitality, grocery anchored retail, real estate debt, anchored core retail, global sale-leaseback, and New York office and retail real estate."[12]

Defendant AR Global Investments LLC is a Delaware limited liability company that maintains its principal place of business in New York City; it is "publicly held out as 'the successor to AR Capital's business' and is functionally identical to AR Capital."[13] For ease of reference, I call both AR Global and AR Capital "AR Capital."

Each AR Capital investment vehicle receives "management services" from a separate, wholly owned AR Capital subsidiary.[14] The AR Capital entities that

---

[8] *Id.*
[9] *Id.* ¶ 24.
[10] *Id.* ¶¶ 2, 24.
[11] *Id.* ¶ 24.
[12] *Id.*
[13] *Id.*
[14] *Id.* ¶ 25.

3

provide these services do not employ anyone; instead, they "provide the required services entirely through employees of AR Capital and related entities."[15] I refer to these wholly owned AR Capital subsidiaries as the "Advisor Defendants," and they include Defendants American Realty Capital Retail Advisor, LLC, American Finance Advisors, LLC, American Realty Capital Healthcare III Advisors, LLC, American Realty Capital Hospitality Advisors, LLC, New York City Advisors, LLC, Global Net Lease Advisors, LLC, American Realty Capital Healthcare II Advisors, LLC, New York Recovery Advisors, LLC, and BDCA Adviser.[16]

Non-party American Realty Capital Properties, Inc. ("ARCP") is a publicly traded REIT that, in October 2014, became implicated in a "massive" accounting fraud.[17]

### 2. Individuals

Defendant Nicholas S. Schorsch was the Executive Chairman of RCAP's Board of Directors until he resigned on December 30, 2014.[18] Schorsch also served as the Chairman, CEO, and controlling owner of AR Capital, which he helped found and in which he holds a 56.02% membership interest.[19] Schorsch maintains "a similar ownership interest in Holdings," and from 2010 to October 1, 2014, he served

---

[15] *Id.*
[16] *Id.* ¶¶ 25(a)–(i).
[17] *Id.* ¶¶ 26, 68, 74.
[18] *Id.* ¶ 17.
[19] *Id.*

4

as the CEO of ARCP, which he created and controlled.[20]   Non-party Shelly D. Schorsch, Nicholas's wife, holds a 7.54% interest in AR Capital.[21]

Defendant William M. Kahane was RCAP's CEO until his resignation on September 21, 2014.[22]   Kahane was an RCAP director until December 30, 2014, and he served on ARCP's Board of Directors until June 24, 2014.[23]   Kahane helped found AR Capital, in which he holds a 13.5% ownership interest.[24]   Like Schorsch, Kahane maintains a similar ownership interest in Holdings.[25]

Defendant Edward M. Weil, Jr. served on RCAP's Board of Directors at all relevant times, and was RCAP's CEO from September 22, 2014, until November 17, 2015.[26]   Weil served as AR Capital's President and COO.[27]   He also served as ARCP's President, COO, Executive Vice President, Treasurer, and Director at various points from 2012 through 2014.[28]   Weil maintains a 3.51% membership interest in AR Capital, and holds a similar interest in Holdings.[29]

---

[20] *Id.* ¶¶ 17, 26.
[21] *Id.* ¶ 17.
[22] *Id.* ¶ 18.
[23] *Id.*
[24] *Id.*
[25] *Id.*
[26] *Id.* ¶ 19.
[27] *Id.*
[28] *Id.*
[29] *Id.*

Defendant Peter M. Budko served as an RCAP director at all relevant times, and he was AR Capital's Chief Investment Officer and Executive Vice President.[30] Budko also held the positions of Chief Investment Officer and Executive Vice President at ARCP from 2010 to 2014.[31] Budko owns a 16.4% membership interest in AR Capital, and he maintains a similar ownership interest in Holdings.[32]

Defendant Brian S. Block served on RCAP's Board of Directors from February 2013 to July 2014, during which time he also worked as RCAP's CFO.[33] Block has served as AR Capital's Executive Vice President and CFO, and as of June 2014, he owned a 3.03% membership interest in AR Capital and a similar interest in Holdings.[34] Starting in December 2010, Block served as ARCP's CFO and Executive Vice President, and he became Treasurer in December 2013.[35] Block was asked to step down from ARCP on October 28, 2014, and he was eventually indicted for conspiracy and securities fraud in the United States District Court for the Southern District of New York.[36]

The Complaint alleges that "[a]t all relevant times, . . . Kahane, Weil, Budko, and Block have done Schorsch's bidding, acting at his direction and control – and

---

[30] *Id.* ¶ 20.
[31] *Id.*
[32] *Id.*
[33] *Id.* ¶ 21.
[34] *Id.*
[35] *Id.*
[36] *Id.*

have been compensated handsomely for so doing."[37]  I refer to Schorsch, Weil, Kahane, Budko, and Block as the "Control Defendants."

Defendant Louisa Quarto was RCS's president from January 2012 through January 2016, during which time she also served as Executive Vice President for AR Capital.[38]  The Complaint alleges that "[a]t all relevant times Quarto has been economically dependent on, acted at the direction of, and given her undivided loyalty to, the Control Defendants."[39]  I refer to all defendants save Block as the "ARC Parties."

*B. Factual Overview*

1. <u>AR Capital, RCAP, and the Control Defendants' Scheme</u>

Schorsch and Kahane founded AR Capital in 2007 to enter the business of creating and sponsoring non-traded REITs—that is, REITs that are not listed on an exchange.[40]  They were soon joined by Weil, Budko, and Block, who received ownership interests in AR Capital.[41]  In 2008, the Control Defendants formed RCS to distribute AR Capital's investment products.[42]  While AR Capital was initially unprofitable, by 2009 and 2010 it was well on its way to becoming "the market

---

[37] *Id.* ¶ 28.
[38] *Id.* ¶ 23.
[39] *Id.*
[40] *Id.* ¶¶ 4, 28.
[41] *Id.* ¶ 28.
[42] *Id.* ¶ 29.

leader in the non-traded REIT space."[43]  From 2010 to 2012, the Control Defendants continued to expand their REIT business, creating funds that spanned several hard asset classes.[44]  RCS was responsible for distributing the AR Capital investment products associated with these funds.[45]

According to the Complaint, AR Capital was very profitable, but the Control Defendants wanted more.[46]  So they hatched a scheme "to make the REIT business even more lucrative by off-loading a key part of their expenses on third parties while retaining all of the profit."[47]

The Control Defendants carried out the first step of this scheme in December 2012, when they formed RCAP as a holding company for (i) RCS, (ii) an investment bank "that also provided transaction management services to direct investment programs and their sponsors," and (iii) a transfer agent "that acted as registrar and transfer agent for direct investment programs and registered investment companies sponsored, co-sponsored, or advised by RCAP's affiliated companies."[48]  The Control Defendants initially owned 100% of RCAP, so that "the profits and losses of AR Capital and RCAP were fungible."[49]

---

[43] Id.
[44] Id. ¶ 30.
[45] Id.
[46] Id.
[47] Id.
[48] Id. ¶ 31.
[49] Id. ¶ 32.

In the next step of the scheme, the Control Defendants took RCAP public in June 2013, creating "third-party resources at RCAP to dedicate toward growing AR Capital."[50] The next spring, RCAP started purchasing several retail broker-dealers, including Cetera Financial Holdings LLC, which RCAP bought for about $1.1 billion.[51] About a month after RCAP acquired Cetera, RCAP had another public offering and raised $385 million.[52]

As a result of the initial and secondary public offerings, the Control Defendants reduced their economic interest in RCAP to about 25%, an interest they held through their ownership of Holdings; yet they continued to control RCAP because they held (again through Holdings) an RCAP B share that gave them majority voting power.[53] Crucially, the Control Defendants (along with Schorsch's wife) remained 100% owners of AR Capital throughout this time.[54] The crux of the Complaint, as I will explain in more detail below, is that the Control Defendants exploited this ownership structure—in which they held a significantly greater economic interest in AR Capital than in RCAP—to enrich themselves at the expense of RCAP.[55] The following chart, taken from the Complaint, summarizes the

---

[50] *Id.* ¶ 33.
[51] *Id.* ¶ 34.
[52] *Id.* ¶ 35.
[53] *Id.* ¶¶ 37, 39.
[54] *Id.* ¶ 2.
[55] *Id.* ¶¶ 2–3.

connections among the Control Defendants, AR Capital, RCAP, and these entities'

subsidiaries as of the completion of the secondary public offering in 2014:[56]



### 2. The Control Defendants Engage in Self-Dealing Transactions Involving AR Capital and RCAP

To understand the significance of these ownership structures to the Control

Defendants' scheme, some background on the non-traded REIT industry and AR

Capital's role in it is necessary. AR Capital typically forms investment vehicles "by

---

[56] *Id.* ¶ 36. "Wholesale" in this chart refers to RCS.

purchasing hard assets such as real estate, which are placed into a tax advantaged REIT or [Business Development Company] structure."[57]  AR Capital is responsible for overseeing the fund, and that entails "obtaining debt financing; buying, selling, and managing assets; and ultimately deciding when and how to sell the business, take it public, or wind it down."[58]  AR Capital itself does not perform these services, however; that falls to the Advisor Defendants, a set of wholly owned AR Capital entities.[59]  Nevertheless, AR Capital receives compensation for the management services provided by its subsidiaries, and this compensation includes

> ongoing asset management fees, typically equal to a percentage (around 1%) of assets under management, or fixed annual fees of similar magnitude; asset acquisition and disposition fees; substantial bonuses upon consummation of a "liquidity event" (such as selling the REIT or taking it public); and various forms of profit sharing sometimes referred to as a "promote."[60]

According to the Complaint, "[a] typical promote might give AR Capital, through its advisor subsidiary, 15% of the REIT's annual profits above 6%."[61]

Meanwhile, RCAP, through RCS, performed the "arduous" task of "marketing the AR Capital products to retail broker-dealers and, ultimately, to

---

[57] *Id.* ¶ 44.

[58] *Id.*

[59] *Id.*  The Complaint is a little unclear on who exactly provides these advisory services.  On the one hand, as I just recited, it says that the services are provided through the Advisor Defendants. *Id.*  On the other hand, it asserts that the Advisor Defendants "have no employees" and that the services are in fact provided "entirely through employees of AR Capital and related entities."  *Id.* ¶ 25.

[60] *Id.* ¶ 44.

[61] *Id.*

11

financial advisors who would then sell the product to their 'mass affluent' retail clients."[62] RCAP distributed all of AR Capital's investment products, making AR Capital "dependent upon RCAP for its growth and survival."[63] Volume was (and remains) critical to AR Capital's profitability, and it earned more fees when RCS sold more AR Capital product to retail investors.[64] Yet, for the reasons explained below, RCAP did not share in AR Capital's success.

Rules promulgated by the Financial Industry Regulatory Authority, Inc. ("FINRA") restrict the amount of compensation that parties involved in the public offering of a REIT can receive. Specifically, FINRA Rule 3210 provides that sales commissions and expenses cannot be more than 10% of the investment amount.[65] "Typically, this 10% 'load' is split, with 7% devoted to incentivizing the financial advisor and 3% 'allowed' to the wholesale broker-dealer, of which 1% to 2% is paid as 'reallowance' to the retail broker-dealer."[66] According to the Complaint, this payment structure means that a wholesaler such as RCS cannot achieve reasonable profitability as a standalone business.[67] Indeed, no company has ever managed that feat.[68] Thus, wholesalers have two options: either "(a) function as a cost center

---

[62] *Id.* ¶ 45.
[63] *Id.*
[64] *Id.*
[65] *Id.* ¶ 46.
[66] *Id.*
[67] *Id.* ¶ 47.
[68] *Id.*

within a larger vertically integrated organization [as RCS originally functioned], or (b) negotiate for a share of the ongoing management economics generated by the investments they raise, either through a joint venture interest in the advisory, or through advisor/subadvisor contractual relationship with the sponsor."[69]

Before RCAP went public in 2013, RCS was a cost center within AR Capital,[70] and the Plaintiff has no quarrel with that arrangement. As the Plaintiff puts it, when the Control Defendants were the sole owners of RCAP, "the profits and losses of AR Capital and RCAP were fungible – defendants would be moving money from one pocket to another."[71] That all changed when the Control Defendants took RCAP public and reduced their economic stake in RCAP to 25%. After the spin-off and public offerings, the Control Defendants used their voting control of RCAP to cause RCS to continue operating as a cost center for AR Capital, of which they (along with Schorsch's wife) remained the sole owners.[72] In other words, RCAP provided significant benefits to AR Capital by wholesaling its investment funds, but RCAP received only 1% to 2% of the investment amount. According to the Complaint, that is "an arrangement no third party wholesaler negotiating on an arms'-length basis would accept."[73]

---

[69] *Id.*
[70] *Id.* ¶ 48.
[71] *Id.* ¶ 32.
[72] *Id.* ¶ 48.
[73] *Id.*

13

As an example of an arrangement that an independent wholesaler would accept, the Plaintiff points to AR Capital's dealings with Phillips Edison & Company, a REIT sponsor specializing in grocery-anchored shopping centers.[74] Phillips Edison created the Phillips Edison Grocery Center REIT I ("PECO I") in 2010.[75] Phillips Edison was unable to wholesale PECO I on its own, so it sought the services of RCS, at the time a wholly owned subsidiary of AR Capital.[76] In exchange for having RCS wholesale PECO I, the Control Defendants persuaded Phillips Edison to provide a separate AR Capital subsidiary with a slice of the advisory fees.[77] PECO I contracted with this AR Capital subsidiary to serve as the REIT's nominal advisor, and "a Phillips Edison-owned entity serv[ed] as sub-advisor."[78] I say the AR Capital subsidiary was a "nominal" advisor because it was the Phillips Edison-owned advisory entity that actually performed most of the management services for PECO I.[79] Thus, "[w]hile Phillips Edison, through [its] advisor [entity], did essentially all of the substantive work, 22.5% of the 'promote' went to the Control Defendants, through [the] ARC [advisor entity]."[80] According to the Plaintiff, this

---

[74] *Id.* ¶ 50.

[75] *Id.*

[76] *Id.*

[77] *Id.*

[78] *Id.*

[79] *Id.*

[80] *Id.* After the accounting fraud at ARCP surfaced, Phillips Edison terminated the advisor agreements between its REITs and the AR Capital advisor entities. *Id.* ¶ 52. Quarto was involved in the negotiations over restructuring the arrangements, and she "insisted that AR Capital should

is a typical example of a market-standard arrangement between a REIT sponsor and a wholesaler.

In contrast to the Phillips-Edison situation just described, the Control Defendants, instead of causing the recently spun-off RCAP to bargain for a slice of the advisory fees, forced RCAP (through RCS) to continue wholesaling AR Capital's REITs in off-market arrangements.[81] In these arrangements, the advisory fees went, in toto, to the Advisor Defendants, which were wholly owned AR Capital subsidiaries.[82] This is the core of the Control Defendants' alleged scheme: by forcing RCAP to bear all the costs of wholesaling AR Capital's investment vehicles, the Control Defendants enriched AR Capital, in which they (together with Schorsch's wife) held a 100% economic stake, to the detriment of RCAP, in which they held only a 25% economic interest. And detriment there was. According to the Plaintiff, RCS's profitability "plummeted in the quarters after the Control Defendants sold a stake to outside investors in 2013, remaining mostly in the red

---

retain 'our' share of the management economics – with 'our' referring to the Control Defendants to whom she was loyal." *Id.*

[81] *Id.* ¶ 54.

[82] *Id.* ¶¶ 25(a)–(i). The Defendants argue that this fee structure was disclosed to RCAP investors in the prospectus for the initial public offering. The prospectus noted that RCAP "generally receives commissions of up to 7.0% of gross offering proceeds for funds raised through the participating independent broker-dealer channel, all of which are redistributed as third-party commissions, in accordance with industry practices." Arffa Aff. Ex. 4 at F-12. It went on to state that RCAP "generally receives up to 3.0% of the gross proceeds from the sale of common stock as a dealer manager fee and also receives fees from the sale of common stock through registered investment advisors." *Id.*

regardless of how much it raised."[83]  But because those losses were suffered mostly by RCAP's public stockholders, and AR Capital benefited handsomely from RCAP's misfortune, the Control Defendants had no incentive to ensure that RCAP received its due.

I pause to describe RCAP's management structure as it existed when the misconduct just described took place.  When RCAP was created, no independent directors sat on its Board.[84]  Independent directors did join the RCAP Board in early 2013 in anticipation of the initial public offering.[85]  But these directors never reviewed any of the "existing and new business arrangements (including periodic renewals and amendments of existing contracts) between RCAP and other Schorsch entities."[86]  Indeed, *all of RCAP's deals with AR Capital* were "negotiated and agreed to on both sides . . . by the Control Defendants and [those loyal to them]."[87]  And the Control Defendants (together with Quarto) allegedly concealed from the Board the off-market nature of the arrangements between AR Capital and RCAP.[88]  For example, in October 2013, the Control Defendants were considering acquiring

---

[83] Compl. ¶ 60.
[84] *Id.* ¶ 54.
[85] *Id.*  The Complaint does not describe the precise composition of the RCAP Board. Nonetheless, the Plaintiff's counsel said at oral argument that "[t]he board of RCAP at all times had a majority of interested directors."  Sept. 29, 2017 Oral Arg. Tr. 44:8–9.
[86] Compl. ¶ 54.
[87] *Id.* ¶ 57.
[88] *Id.* ¶ 54.

16

Strategic Capital Partners LLC ("Strat Cap"), an independent wholesaler.[89] On October 3, an RCS employee sent Weil and Quarto a slide deck summarizing the deals Strat Cap had with the REITs it wholesaled; in those deals, and unlike RCAP in its arrangements with AR Capital, Strat Cap received 20% to 25% of the advisory fees.[90] Because this information would reveal that RCAP was getting a raw deal from AR Capital, "it was excluded from the single slide deck provided to the RCAP Board of Directors to obtain their written consent to the Strat Cap acquisition on October 23, 2013."[91]

### 3. The Control Defendants Overstaff RCS

According to the Plaintiff, the Control Defendants' disloyalty to RCAP did not stop at the lopsided arrangements between AR Capital and RCAP. The Plaintiff also alleges that the Control Defendants caused RCAP "to maintain an irrational and unsustainable staffing level for . . . [RCS], even as that business cratered."[92] Hiring and keeping on too many people was bad for RCAP, but that did not bother the Control Defendants, who received "continuing benefits from even modest additional sales of AR Capital products."[93] That is because, as noted above, volume was crucial

---

[89] *Id.* ¶ 55.
[90] *Id.*
[91] *Id.*
[92] *Id.* ¶ 58.
[93] *Id.*

17

to AR Capital's success, and the way to achieve more volume was to increase staff at RCS, the entity responsible for wholesale distribution of AR Capital's products.[94]

Before RCAP went public in June 2013, it was "modestly profitable when it raised $1 billion or more of equity in a given quarter."[95] But after the initial public offering, RCAP's "profitability plummeted . . . remaining mostly in the red regardless of how much it raised."[96] As discussed above, the Plaintiff ascribes the change in RCAP's fortunes to the misalignment between control and equity created by the ownership structures of RCAP and AR Capital. These ownership structures created perverse incentives for the Control Defendants, who, once RCAP went public, increased RCS's staff and "stubbornly maintained the same high staffing levels despite declining profitability."[97] Specifically, RCS kept on 190 to 200 employees between December 2013 and August 2015, even though RCS's "business was dying throughout 2015, with devastating losses that ultimately drove RCAP into bankruptcy."[98] Again, while these staffing levels were irrational from RCAP's perspective, they benefited AR Capital, "which bore none of the costs but benefitted from having available the maximum capacity to push product."[99] RCS did not start

---

[94] *Id.*
[95] *Id.* ¶ 60.
[96] *Id.*
[97] *Id.* ¶ 63.
[98] *Id.* ¶ 64.
[99] *Id.*

18

firing people in large numbers until November 2015, when it was already winding down.[100]

### 4. The Control Defendants Cause RCAP to Make Imprudent Acquisitions

The Plaintiff alleges that the Control Defendants had RCAP pursue acquisitions that served AR Capital's interests rather than RCAP's.[101] First, in May 2014, RCAP agreed to purchase Strat Cap, a wholesaler of non-traded investment vehicles that competed with AR Capital.[102] Before this acquisition took place, RCAP's management had told public investors that it intended "to grow its retail broker-dealer business and deemphasize" wholesaling.[103] Nonetheless, Schorsch and the other Control Defendants pushed the Strat Cap Acquisition because it would benefit AR Capital.[104] Specifically, the acquisition would "reduc[e] competition with AR Capital's products by eliminating an independent wholesaler that had facilitated distribution of smaller, non-traded funds; and (2) open[] up new lines of distribution for AR Capital products by providing access to national, full-service

---

[100] *Id.* The Plaintiff alleges that Quarto, RCS's President, received a "risk assessment" in July 2014 "showing that [RCS] had far more salespeople than their nearest competitors," and "reveal[ing] that [RCS] was hosting too many large events to attract business, without focusing on basic cost management." *Id.* ¶ 65. But neither Quarto nor anyone else in RCAP's management did anything about it. *Id.* Moreover, Quarto "knew the arrangements [between RCAP and AR Capital] were off-market, and failed to disclose and indeed affirmatively hid that information from the independent directors in connection with new transactions." *Id.* ¶ 54.
[101] *Id.* ¶ 89.
[102] *Id.* ¶ 90.
[103] *Id.* ¶ 42.
[104] *Id.* ¶ 90.

19

broker-dealers, known colloquially as 'wire houses.'"[105]  RCAP paid $77.5 million to acquire Strat Cap, and the deal "was rushed through board approval without a meeting, through written consent on the basis of a single powerpoint deck containing a single page 'valuation analysis.'"[106]  The Control Defendants did not tell the Board that they "intended to require Strat Cap to distribute AR Capital products on the same abusive terms they were already imposing on [RCS]."[107]  According to the Plaintiff, the Strat Cap acquisition turned out poorly for RCAP, and toward the end of 2015, RCAP was forced to sell Strat Cap back to its previous owner for $8.8 million and the waiver of several earn-out obligations.[108]

The Plaintiff also challenges RCAP's acquisition of Snyder Kearney LLC, a deal designed solely "to defang a critic of AR Capital products."[109]  Snyder Kearney was a law firm that performed "due diligence on alternative investment product offerings for broker-dealers, serving a function much like rating agencies and equity analysts do with respect to publicly traded investments."[110]  Snyder Kearney was a thorn in AR Capital's side, having "frequently identified problems in AR Capital

---

[105] *Id.*

[106] *Id.* ¶¶ 91–92.  As noted above, the RCAP Board was not told that "Strat Cap's historic record of positive EBITDA was the result of running wholesale distribution on arms'-length terms, bargaining for a percentage of their clients' [advisory fees] in order to earn a reasonable return." *Id.* ¶ 92.

[107] *Id.*

[108] *Id.* ¶ 94.

[109] *Id.* ¶ 95.

[110] *Id.* ¶ 96.

20

products."[111]  So, in order to remove the threat posed by Snyder Kearney, Schorsch had RCAP "acquire all of the firm's assets and hire all of its employees in exchange for a payment of $10,092,000 to Todd Snyder and John Kearney."[112]  The law firm was dissolved and transformed into "SK Research," "an in-house RCAP research arm."[113]  The deal was approved solely by the RCAP Board's Executive Committee, which consisted of Schorsch, Kahane, Weil, Budko, and Block.[114]  The Plaintiff alleges that no reasonable person could believe the acquisition would serve RCAP's interests, primarily because "SK Research would never be taken seriously by the investment community as an independent and objective source of research, in light of the glaring perception of conflict of interest that inevitably came with being owned by a Schorsch-controlled company."[115]  Like the Strat Cap acquisition, the SK Research acquisition "was an economic disaster for RCAP," and RCAP sold all of SK Research's assets back to Snyder and Kearney for about $1 million.[116]

Another transaction that, according to the Plaintiff, benefited AR Capital at the expense of RCAP, was RCAP's acquisition of a majority interest in Docupace Technologies, which produced "back-office software for broker-dealers."[117]  This

---

[111] *Id.* ¶ 97.
[112] *Id.*
[113] *Id.*
[114] *Id.* ¶ 98.
[115] *Id.* ¶ 99.
[116] *Id.* ¶ 101.
[117] *Id.* ¶ 102.

21

software was intended to make it easier for retail-broker dealers to process orders for non-traded investment products.[118] AR Capital wanted to develop the software so that retail broker-dealers would be better equipped to sell its investment vehicles, "[b]ut the acquisition had no business rationale for RCAP, which is not a technology company and already had adequate back-office software solutions in place."[119] As with the Snyder Kearney acquisition, the Docupace deal was approved only by the RCAP Board's Executive Committee, which did not contain any independent directors.[120] Moreover, "[t]he unanimous written consent approved by the RCAP executive committee included a requirement that Docupace enter into a product agreement with AR Capital upon execution of the acquisition's Contribution Agreement."[121] RCAP paid "$35.4 million in cash and common stock, plus up to $48 million in 2015 and 2016 if certain earnings targets were met," to acquire its interest in Docupace.[122] Docupace did not do well after RCAP bought a majority interest in it, "generat[ing] only $7.5 million in gross revenues and incurr[ing] more than $5.3 million in net pre-tax losses (before impairment)."[123] After it filed for

---

[118] *Id.*
[119] *Id.*
[120] *Id.* ¶ 103.
[121] *Id.* ¶ 106.
[122] *Id.* ¶ 103.
[123] *Id.* ¶ 108.

bankruptcy, RCAP sold its interest in Docupace back to Docupace's management for $9 million.[124]

5. Proxy Fraud

In November 2014, Schorsch and his colleagues were implicated in an accounting fraud scandal at ARCP, a publicly traded REIT they controlled.[125] The scandal "taint[ed] all AR Capital products and all Schorsch-related businesses."[126] The Control Defendants tried to address this situation by arranging for a partial buy-out of AR Capital by Apollo Global Management, the well-known private equity fund.[127] Apollo would not buy AR Capital unless it could purchase RCS as well.[128] Thus, Schorsch told a Special Committee of independent RCAP directors, who were already contemplating a restructuring for RCAP, that the Control Defendants would block any deal for RCAP except for the one Schorsch was negotiating with Apollo.[129] Despite Schorsch's warning, the RCAP Special Committee obtained an investment proposal from "a large and well-respected private investment firm" to the tune of $300 to $350 million.[130] Apollo had proposed a deal for only $100

---

[124] *Id.*
[125] *Id.* ¶ 8.
[126] *Id.*
[127] *Id.* ¶ 110.
[128] *Id.*
[129] *Id.* ¶¶ 109–10.
[130] *Id.* ¶ 111.

23

million, yet Schorsch "demanded that the[ Special Committee members] 'put their pencils down' on anything other than his favored Apollo deal."[131]

In August 2015, the Control Defendants reached agreement with Apollo on several transactions, including Apollo's purchase of RCS for about $20 million (subject to a possible downward adjustment) and Apollo's acquisition of 60% of AR Capital's business for $378 million in cash and stock (subject to a half-billion dollars in potential upward adjustment).[132] The AR Capital component of the deal required AR Capital to amend the charters of some of its investment funds to, among other things, "increase the power of the investment fund boards and decrease the ability of shareholders to remove or make demands of board members."[133] These changes could not be enacted unless fund investors gave their approval.[134] In addition to hiring a proxy solicitation firm to solicit the approvals, the Control Defendants and those loyal to them "placed extraordinary pressure on [RCS] employees to deliver the required proxies."[135] RCS employees did not receive proxy solicitation training, and they did not have a script for investor calls.[136]

---

[131] *Id.* ¶¶ 111–12.
[132] *Id.* ¶ 113. Apollo also agreed to purchase $25 million of RCAP preferred stock and to enter "an off-market strategic partnership agreement . . . [with] RCAP that would require RCAP to distribute Apollo investment products on terms equal to or better than the already-favorable treatment being accorded to AR Capital products." *Id.*
[133] *Id.* ¶ 115.
[134] *Id.* ¶ 116.
[135] *Id.*
[136] *Id.* ¶ 117.

The Massachusetts Securities Division (the "MSD") eventually filed an administrative complaint against RCS alleging that its employees, acting under pressure from management, "acted to 'steamroll' shareholders into voting in favor of management, including at least two instances where [RCS] employees impersonated shareholders to vote their shares."[137] "In December 2015, RCS entered into a consent order essentially stipulating to the accuracy of all of the allegations in the complaint, paying a $3 million fine, and agreeing to permanently discontinue wholesale operations in Massachusetts."[138] By this point, Apollo and AR Capital had terminated the agreements to acquire 60% of AR Capital's business and to purchase RCS.[139]

*C. This Litigation*

The Plaintiff filed its Complaint on March 8, 2017. The Complaint contains three counts. Count I is brought against Holdings, the Control Defendants, and Quarto, and it alleges that they breached their duties of care and loyalty in connection with the conduct outlined above.[140] Count II is brought in the alternative against the same defendants, and it asserts that even if these defendants did not owe fiduciary

---

[137] *Id.* ¶ 120.
[138] *Id.* ¶ 122. According to the Complaint, "[w]hile the MSD complaint identified only two specific instances of impersonation, RCAP's outside counsel uncovered numerous additional serious instances of misconduct during the summer and fall of 2015, all related to proxy efforts for the benefit of AR Capital." *Id.* ¶ 121.
[139] *Id.* ¶¶ 119, 122.
[140] *Id.* ¶¶ 126–30.

duties to RCAP or its subsidiaries at the relevant times, they nevertheless are liable for aiding and abetting breaches of fiduciary duty by other defendants.[141]  Count III is brought against AR Capital, AR Global, and the Advisor Defendants, and it alleges that each of these defendants was unjustly enriched by the conduct described above, and that such conduct warrants the imposition of a constructive trust.[142]

The ARC Parties moved to partially dismiss the Complaint on May 26, 2017. The ARC Parties seek dismissal of every aspect of the Complaint except for the allegations challenging the never-consummated Apollo transaction and the decision to acquire Cole Capital Partners, LLC, Cole Capital Advisors, Inc., and various Cole Capital subsidiaries from ARCP.[143]  Block joins in the arguments for dismissal advanced by the ARC Parties.  I heard oral argument on the Defendants' Motions to Dismiss on September 29, 2017.

## II. ANALYSIS

The Defendants have moved to partially dismiss the Complaint under Court of Chancery Rule 12(b)(6).  When reviewing such a motion,

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences

---

[141] *Id.* ¶¶ 131–33.

[142] *Id.* ¶¶ 134–39.

[143] *See* ARC Parties' Reply Br. 3 (noting that the ARC Parties do not move to dismiss allegations relating to the Cole Capital and Apollo deals); Sept. 29, 2017 Oral Arg. Tr. 7:15–20 ("THE COURT: And if you're successful, what will be left of the complaint? MR. ARFFA: The only thing -- two things, I should say, that would be allowed are the allegations as to the Cole Capital transaction and the allegations as to the Apollo transaction.").

in favor of the non-moving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[144]

I need not, however, "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[145]

At oral argument, counsel for the Plaintiff and the ARC Parties suggested that the "core" claim in this case involves the allegation that the Control Defendants used their control over RCAP to cause it to enter into off-market arrangements with AR Capital, which they and Schorsch's wife wholly owned.[146] The Plaintiff challenges other decisions allegedly designed to benefit AR Capital at RCAP's expense, though the Control Defendants did not stand on both sides of those transactions. And the Plaintiff brings claims for aiding and abetting breaches of fiduciary duty and unjust enrichment. I first address the Defendants' arguments for dismissing the core fiduciary duty claim. I then turn to the proxy fraud allegations and the other allegedly self-interested transactions and decisions challenged by the Plaintiff. I next address the Defendants' argument that Quarto and Holdings should be dismissed from this action. I end by discussing the Plaintiff's claims for unjust enrichment and aiding and abetting.

---

[144] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (footnotes and internal quotation marks omitted).

[145] *Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011).

[146] *E.g.*, Sept. 29, 2017 Oral Arg. Tr. 8:21–9:10, 47:1–6.

*A. The Core Claim*

As I just noted, the Complaint focuses primarily on a series of allegedly self-dealing transactions in which the Control Defendants caused RCAP, which they collectively controlled but in which they held only a 25% economic stake, to serve as a cost center for AR Capital, in which they (along with Schorsch's wife) retained a 100% ownership interest. These allegations state a claim for breach of the duty of loyalty against the Control Defendants.

"The business judgment rule is the default standard of review" for evaluating the decisions of corporate fiduciaries.[147] Under that rule, a decision made by informed and loyal corporate fiduciaries "will not be overturned by the courts unless it cannot be 'attributed to any rational business purpose.'"[148] The plaintiff bears the burden of proof in attempting to rebut the presumption created by the business judgment rule.[149] A plaintiff seeking to rebut the presumption "'assumes the burden

---

[147] *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011).

[148] *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993) (quoting *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971)); *see also eBay Domestic Holdings, Inc. v. Newmark*, 16 A.3d 1, 36 (Del. Ch. 2010) ("Under the business judgment rule, when a party challenges the decisions of a board of directors, the Court begins with the 'presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" (quoting *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1373 (Del. 1995))).

[149] *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 64 (Del. 1989).

of providing evidence that [corporate fiduciaries], in reaching their challenged decision,' breached their duty of loyalty or care."[150]

"[T]he duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally."[151]  The duty of loyalty is implicated when a corporate fiduciary "appear[s] on both sides of a transaction or . . . receiv[es] a personal benefit from a transaction not received by the shareholders generally."[152]  "If corporate fiduciaries stand on both sides of a challenged transaction, . . . the burden shifts to the fiduciaries to demonstrate the 'entire fairness' of the transaction."[153]  A plaintiff alleging that corporate fiduciaries stood on both sides of a challenged transaction need not plead that they received a material benefit from the deal.[154]  And if the plaintiff alleges facts that invoke the entire fairness standard, dismissal via a Rule 12(b)(6) motion is typically inappropriate.[155]

---

[150] *Huff Energy Fund, L.P. v. Gershen*, 2016 WL 5462958, at *11 (Del. Ch. Sept. 29, 2016) (quoting *Cede & Co.*, 634 A.2d at 361).

[151] *Cede & Co.*, 634 A.2d at 361.

[152] *Id.* at 362.

[153] *Oliver v. Boston Univ.*, 2006 WL 1064169, at *18 (Del. Ch. Apr. 14, 2006).

[154] *London v. Tyrrell*, 2008 WL 2505435, at *5 (Del. Ch. June 24, 2008); *see also Orman v. Cullman*, 794 A.2d 5, 25 n.50 (Del. Ch. 2002) ("[W]henever a director stands on both sides of the challenged transaction he is deemed interested and allegations of materiality have not been required.").

[155] *Orman*, 794 A.2d at 20 n.36; *see also In re KKR Fin. Holdings LLC S'holder Litig.*, 101 A.3d 980, 990 (Del. Ch. 2014) ("If the plaintiff is able to rebut the business judgment presumption, dismissal at this stage of the litigation would, in all likelihood, be inappropriate."), *aff'd sub nom. Corwin v. KKR Fin. Holdings LLC*, 125 A.3d 304 (Del. 2015).

The Complaint in this case adequately alleges that the Control Defendants owed fiduciary duties to RCAP. In addition to serving as officers or directors of RCAP, these individuals exercised effective control over the company through their collective ownership of Holdings, which held a B share in RCAP that conferred majority voting power.[156] Despite their role as fiduciaries for RCAP's public stockholders, the Control Defendants engineered a series of transactions between RCAP and AR Capital that allegedly siphoned value away from RCAP and to AR Capital. The incentive to engage in these self-dealing transactions arose from the Control Defendants' ownership of a significantly larger economic stake in AR Capital than in RCAP. Moreover, none of the transactions that form the basis of the Plaintiff's core claim were approved by a majority of disinterested and independent directors.[157] Instead, "[e]very one of [RCS]'s business deals with RCAP was negotiated and agreed to on both sides . . . by the Control Defendants and their minions."[158] The Control Defendants were therefore squarely on both sides of the

---

[156] Compl. ¶¶ 17–21, 37. Because all of the Control Defendants served as either directors or officers of RCAP at the relevant times, they owed fiduciary duties to RCAP and its stockholders. *See Gantler v. Stephens*, 965 A.2d 695, 708–09 (Del. 2009) ("[O]fficers of Delaware corporations, like directors, owe fiduciary duties of care and loyalty, and . . . the fiduciary duties of officers are the same as those of directors."). The Complaint also supports an inference that the Control Defendants acted as a control group with respect to RCAP. *See Frank v. Elgamal*, 2014 WL 957550, at *18 (Del. Ch. Mar. 10, 2014) ("A group of stockholders, none of whom individually qualifies as a controlling stockholder, may collectively be considered a control group that is analogous, for standard of review purposes, to a controlling stockholder.").
[157] Compl. ¶ 54.
[158] *Id.* ¶ 57. I am aware of the long line of Delaware cases holding that "the entire fairness framework governs any transaction between a controller and the controlled corporation in which the controller receives a non-ratable benefit." *In re Ezcorp Inc. Consulting Agreement Derivative*

30

challenged wholesaling agreements between AR Capital and RCAP. That invokes entire fairness review, which in turn precludes dismissal of the core claim on a Rule 12(b)(6) motion.[159]

The Defendants offer several reasons for dismissing the core claim. None of them persuade. First, the Defendants argue that because the conduct underlying the core claim occurred before RCAP went public, it could not form the basis of a fiduciary duty claim against the Control Defendants, who did not owe any duties to RCAP's prospective stockholders. True, under *Anadarko Petroleum Corp. v.*

---

*Litig.*, 2016 WL 301245, at *11 (Del. Ch. Jan. 25, 2016), *reconsideration granted in part*, 2016 WL 727771 (Del. Ch. Feb. 23, 2016). These cases often rest on the concern that "directors laboring in the shadow of a controlling stockholder face a threat of implicit coercion because of the controller's ability to not support the director's re-nomination or re-election, or to take the more aggressive step of removing the director." *Id.* at *20; *see also Larkin v. Shah*, 2016 WL 4485447, at *9 (Del. Ch. Aug. 25, 2016) ("[C]ases where the controller stands on both sides of the transaction present a particularly compelling reason to apply entire fairness: both corporate decision-making bodies to which Delaware courts ardently defer—the board of directors and disinterested voting stockholders—are considered compromised by the controller's influence."). The case before me, however, is more straightforward. As I just noted, all of the challenged deals between RCAP and AR Capital were engineered and approved solely by the Control Defendants. I therefore analyze the core claim as a simple case of self-dealing by the Control Defendants.

[159] Where a complaint invokes entire fairness review, dismissal under Rule 12(b)(6) is typically inappropriate. Dismissal may be appropriate in cases where the defendant shows "that the challenged transaction was entirely fair based solely on the allegations of the complaint and the documents integral to it." *Hamilton Partners, L.P. v. Highland Capital Mgmt., L.P.*, 2014 WL 1813340, at *12 (Del. Ch. May 7, 2014). But the Defendants have not tried to make that showing here. And for good reason: all the Plaintiff must do at this stage is "allege some facts that tend to show that the transaction[s] w[ere] not fair." *Solomon v. Pathe Commc'ns Corp.*, 1995 WL 250374, at *5 (Del. Ch. Apr. 21, 1995), *aff'd*, 672 A.2d 35 (Del. 1996). Entire fairness has two components: fair dealing and fair price. *Cede & Co.*, 634 A.2d at 361. It is reasonably conceivable that the transactions on which the core claim is premised were not the product of fair dealing, since they were engineered and approved by conflicted fiduciaries. *See Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1173 (Del. 1995) ("The independence of the bargaining parties is a well-recognized touchstone of fair dealing."). And I can infer unfair price from the Complaint's detailed allegations about the off-market nature of the arrangements between AR Capital and RCAP.

31

*Panhandle Eastern Corp.*, 545 A.2d 1171, 1177 (Del. 1988), fiduciary duties do not run to prospective stockholders.[160] But the Defendants' *Anadarko* argument rests on a false premise. RCAP went public in June 2013.[161] While several allegedly off-market deals between AR Capital and RCAP predate the initial public offering, the Control Defendants continued to cause RCAP to agree to such deals after it went public. Indeed, four of the nine advisory agreements that allegedly enriched AR Capital at RCAP's expense were entered after RCAP's initial public offering.[162] In other words, the Control Defendants did not stop engaging in self-dealing transactions involving RCAP and AR Capital once RCAP went public; those deals continued to be made even after the Control Defendants assumed fiduciary obligations to RCAP's public stockholders. *Anadarko* does not compel dismissal of the core claim.

The Defendants also argue that the core claim fails because it rests on the assumption that the Control Defendants should have caused RCS to adopt an illegal business model. As discussed above, FINRA Rule 3210 prohibits a wholesale broker-dealer such as RCS from receiving compensation exceeding 10% of the

---

[160] *See* 1 R. Franklin Balotti & Jesse A. Finkelstein, *Balotti and Finkelstein's Delaware Law of Corporations and Business Organizations* § 4.16 (3d ed. 2017) ("Although fiduciary duties are owed to stockholders, they do not run to prospective stockholders." (citing *Anadarko*, 545 A.2d at 1177)).
[161] Compl. ¶ 15.
[162] *Id.* ¶¶ 25(a)–(i).

investment amount.[163]  Under the Defendants' reading of the Complaint, the Control

Defendants should have caused RCS to receive a slice of the advisory fees for the

AR Capital investment products it wholesaled.  The problem, according to the

Defendants, is that such an arrangement would violate FINRA's restrictions on the

amount of fees wholesalers such as RCS may charge in connection with investment

products they distribute.  Since Delaware does not "charter lawbreakers,"[164] so the

argument goes, the Plaintiff's core claim cannot stand.

It is true that the Complaint is less than precise about who, exactly, should

have received the advisory fees that went to the Advisor Defendants.  The Complaint

decries "dealer-manager agreements that obligated [RCS] to distribute AR Capital

product without receiving any share of the ongoing management economics."[165]

That points to RCS as the entity to which the advisory fees should have gone, an

arrangement that the Plaintiff appears to concede would be illegal.[166]  But the

Complaint also suggests a different possibility: that RCAP should have created

separate entities to receive advisory fees in connection with AR Capital-sponsored

investment vehicles.  For example, the Complaint describes AR Capital's

---

[163] *Id.* ¶ 46.

[164] *In re Massey Energy Co.*, 2011 WL 2176479, at *20 (Del. Ch. May 31, 2011); *see also Kandell v. Niv*, 2017 WL 4334149, at *2 (Del. Ch. Sept. 29, 2017) ("Where directors knowingly cause or permit a Delaware corporation to violate positive law, they have acted in bad faith, and are liable to the corporation for resulting damages.").

[165] Compl. ¶ 54.

[166] *See* Pl.'s Answering Br. 43 ("FINRA restricts only the compensation that *RCS* as wholesaler could earn for wholesale distribution" (emphasis in original)).

arrangements with Phillips Edison, which sought out the Control Defendants before RCAP's initial public offering to retain RCS as a wholesaler for one of Phillips Edison's REITs.[167] In exchange for receiving RCS's wholesaling services, Phillips Edison agreed to provide an AR Capital subsidiary (American Realty Capital Advisors II LLC) with a slice of the advisory fees.[168] This AR Capital subsidiary did not do much advising, and the actual work of managing the REIT's day-to-day operations fell to a Phillips Edison-owned sub-advisor.[169]

One reading of this section of the Complaint is that RCAP should have done what AR Capital did with Phillips Edison—that is, set up separate advisory subsidiaries that would receive a portion of the advisory fees in connection with AR Capital-sponsored REITs wholesaled by RCS. This reading finds support in the allegation that independent wholesalers cannot maintain profitability unless they "negotiate for a share of the ongoing management economics generated by the investments they raise, either through a joint venture interest in the advisory, *or through advisor/subadvisor contractual relationship with the sponsor*."[170] The Defendants do not argue that the type of arrangement suggested by the Phillips Edison example would be illegal. Given the plaintiff-friendly standard that governs

---

[167] Compl. ¶ 50.
[168] *Id.*
[169] *Id.*
[170] *Id.* ¶ 47 (emphasis added).

a motion to dismiss, the Complaint's arguably equivocal allegations about the business model that the Control Defendants would have had RCAP adopt in the context of arm's-length bargaining do not warrant dismissing the core fiduciary duty claim.[171] Ultimately, I need not identify, at this stage, what a loyal board would have provided to find that the Complaint adequately alleges that the structure actually imposed was unfair.

Next, the Defendants argue that the core claim is not reasonably conceivable because the allegedly unfair arrangements between RCAP and AR Capital "were fully disclosed to the financial markets and investors, who nevertheless supported and invested in RCAP."[172] Put differently, anyone who cared to know could learn about RCS's business model from public documents, yet investors purchased stock in light of those disclosures, which included the supposedly off-market deals challenged in the Complaint. That, according to the Defendants, suggests that I should simply reject as unsupported the Complaint's detailed allegations about the Control Defendants' scheme to enrich themselves by exploiting RCAP.

I decline the invitation. First, I cannot say on this record that the disclosures the Defendants point to tell the whole story, at least from the Plaintiff's perspective.

---

[171] *See Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 536 (Del. 2011) (holding that courts must "accept even vague allegations in the Complaint as 'well-pleaded' if they provide the defendant notice of the claim").
[172] ARC Parties' Opening Br. 32.

The prospectus for RCAP's initial public offering disclosed, for example, that RCAP "generally receives up to 3.0% of the gross proceeds from the sale of common stock as a dealer manager fee and also receives fees from the sale of common stock through registered investment advisors."[173]  But the prospectus did not discuss a key aspect of the Plaintiff's core claim: the allegedly off-market and largely unprofitable nature of such an arrangement.  In sum, the Defendants' argument presents an explicitly factual question: Given that the challenged arrangements were supposedly disclosed to investors, some of whom nevertheless chose to invest, could the deals between RCAP and AR Capital really have been as disadvantageous to RCAP as the Plaintiff suggests?  I cannot resolve that question on a Rule 12(b)(6) motion.[174]

Finally, the Defendants try to recast the core claim as a corporate opportunity claim.  Having done so, the Defendants then suggest that the Plaintiff has failed to adequately allege the usurpation of a corporate opportunity belonging to RCAP.  Our Supreme Court has established the following test for evaluating corporate opportunity claims:

> [A] corporate officer or director may not take a business opportunity for his own if: (1) the corporation is financially able to exploit the opportunity; (2) the opportunity is within the corporation's line of business; (3) the corporation has an interest or expectancy in the

---

[173] Arffa Aff. Ex. 4 at F-12.
[174] *See Malpiede v. Townson*, 780 A.2d 1075, 1082 (Del. 2001) ("Because a motion to dismiss under Chancery Rule 12(b)(6) must be decided without the benefit of a factual record, the Court of Chancery may not resolve material factual disputes; instead, the court is required to assume as true the well-pleaded allegations in the complaint.").

opportunity; and (4) by taking the opportunity for his own, the corporate fiduciary will thereby be placed in a position inimicable to his duties to the corporation.[175]

The Defendants read the Complaint to allege that the Control Defendants took for themselves the opportunity to receive advisory fees in connection with AR Capital-sponsored investment funds. In the Defendants' interpretation of the Complaint, that opportunity is alleged to have belonged to RCAP, not the Control Defendants. But the Complaint does not have to be read that way. As I said above, the Control Defendants allegedly stood on both sides of a series of transactions between AR Capital and RCAP. That is a "classic example[] of . . . self-interest in a business transaction,"[176] and there is no need to invoke the corporate opportunity doctrine in order to find that the transactions at the heart of the core claim trigger entire fairness review. Moreover, at oral argument, the Plaintiff's counsel said that it never intended to pursue a corporate opportunity claim.[177] Thus, I will not shoehorn the Plaintiff's allegations into a theory of liability that, according to the Defendants at least, cannot survive a motion to dismiss.[178]

---

[175] *Broz v. Cellular Info. Sys., Inc.*, 673 A.2d 148, 155 (Del. 1996).

[176] *Cede & Co.*, 634 A.2d at 362.

[177] *See* Sept. 29, 2017 Oral Arg. Tr. 50:24–51:5 ("MR. HOROWITZ: [W]e did not characterize this as a usurpation of corporate opportunity claim. They did. I think there was one place in the complaint where they said something about it being a usurpation of corporate opportunity, but that's not how it's pled. It's a breach of duty of loyalty claim.").

[178] *See In re Tyson Foods, Inc.*, 919 A.2d 563, 601 (Del. Ch. 2007) (rejecting the defendants' "attempt to recharacterize [a breach of contract claim] as a fiduciary duty claim in order to draw themselves within the protection of the [Section 102(b)(7)] exculpatory clause"). At oral argument, counsel for the ARC Parties pointed to a provision in RCAP's charter that purportedly

37

*B. The Proxy Fraud*

According to the Plaintiff, the Control Defendants breached their fiduciary

duties when they facilitated proxy fraud committed by RCS employees. The Control

Defendants needed investors in AR Capital funds to approve charter amendments so

that Apollo's acquisition of a majority stake in AR Capital—along with its purchase

of RCS—could go forward. The Control Defendants favored the Apollo deal—in

which Apollo would not buy AR Capital unless it could have RCS too—because

they thought Apollo's acquisition of a majority stake in AR Capital would help

"cleanse the ongoing taint of the accounting fraud [at ARCP]."[179] The Control

Defendants therefore hired a proxy solicitation firm to get the required approvals,

but that was not all they did to get the desired proxies. They also "placed

extraordinary pressure on [RCS] employees to deliver the required proxies."[180]

These employees did not receive training in proxy solicitation, and they did not have

a script for investor calls.[181] RCS eventually paid a $3 million fine to the

Massachusetts Securities Division after that body filed an administrative complaint

---

waived any duty held by AR Capital to refrain from engaging in similar business activities as RCAP. Sept. 29, 2017 Oral Arg. Tr. 18:15–20:20. The Defendants did not mention that charter provision in briefing, so they have waived any reliance on it. *Fortis Advisors LLC v. Shire US Holdings, Inc.*, 2017 WL 3420751, at *8 n.32 (Del. Ch. Aug. 9. 2017). And even if I were to consider the charter provision, it would not help the Defendants, because I have already concluded that the Plaintiff's core claim need not be viewed as one sounding in usurpation of corporate opportunity.

[179] Pl.'s Answering Br. 30.
[180] Compl. ¶ 116.
[181] *Id.* ¶ 117.

against RCS alleging that its employees, under pressure from management, "acted to 'steamroll' shareholders into voting in favor of management, including at least two instances where [RCS] employees impersonated shareholders to vote their shares."[182]

At the outset, the allegations about proxy fraud at RCS are ancillary to the Plaintiff's challenge to the Apollo transaction itself, which the Defendants do not move to dismiss. Thus, to the extent that these allegations are relevant to an evaluation of the Apollo deal, they will be addressed at a later stage of this litigation. Standing alone, however, the proxy fraud allegations do not state a claim for breach of fiduciary duty. True, when corporate fiduciaries "intentionally cause their corporation to violate positive law, they act in bad faith; this state does not 'charter lawbreakers.'"[183] But the Complaint alleges only that "the Control Defendants and their minions placed extraordinary pressure on [RCS] employees to deliver the required proxies."[184] There is nothing illegal about that, at least absent additional allegations suggesting that the "pressure" exerted by the Control Defendants involved directions to commit unlawful conduct. Moreover, the Plaintiff does not even attempt to assert a *Caremark* claim, which requires a showing that "(a) the

---

[182] *Id.* ¶ 120.
[183] *Kandell*, 2017 WL 4334149, at *16 (quoting *In re Massey Energy Co.*, 2011 WL 2176479, at *20).
[184] *Id.* ¶ 116.

directors utterly failed to implement any reporting or information system or controls; *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention."[185]  I find that the proxy fraud allegations cannot by themselves support a claim for breach of fiduciary duty.

### C. The Allegedly Self-Interested Acquisitions and the Decision to Overstaff RCS

The Plaintiff does not limit its fiduciary duty claim to the self-dealing transactions and proxy fraud discussed above.  It also challenges the Control Defendants' decision to cause RCAP to acquire Strat Cap, Docupace, and Snyder Kearney.  The Control Defendants did not stand on both sides of these acquisitions, but the deals were allegedly pursued because they would benefit AR Capital, not RCAP.  That, according to the Plaintiff, makes the Control Defendants interested in these transactions, thereby triggering entire fairness review.[186]  The Plaintiff also attacks the Control Defendants' decision to maintain high levels of staffing at RCS despite its declining fortunes, a decision that the Plaintiff alleges similarly benefited AR Capital at RCAP's expense.  The Plaintiff appears to argue that the Control Defendants were interested in RCS's overstaffing because of the benefits it provided

---

[185] *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

[186] *See* Pl.'s Answering Br. 52 ("The Complaint's allegations regarding the three challenged acquisitions easily meet th[e] standard [for establishing directorial interest in a transaction], because each was undertaken primarily to serve the interests of AR Capital and bestowed significant benefits upon the Control Defendants not shared by RCAP's public shareholders.").

to AR Capital.[187] The explanation for all of these decisions supposedly lies in the Control Defendants' holding a larger economic stake in AR Capital than in RCAP, which they nevertheless controlled through the B share.

Because the Control Defendants did not stand on both sides of the challenged acquisitions or staffing decisions, they do not involve the kind of evident self-dealing that of itself triggers entire fairness review.[188] Instead, the Plaintiff's theory is that the Control Defendants received financial benefits from these decisions that were not shared with RCAP's other stockholders. That is one way to demonstrate that a corporate fiduciary is interested in a transaction.[189] But "in the absence of self-dealing, it is not enough to establish the interest of a [corporate fiduciary] by alleging that he received *any* benefit not equally shared by the stockholders. Such benefit must be alleged to be *material* to that [fiduciary]."[190] A benefit is material if it is so significant, "in the context of the [fiduciary]'s economic circumstances, as to have

---

[187] *See Id.* at 48 ("The Complaint alleges that the Control Defendants, seeking to drive sales regardless of the impact on RCAP, caused RCS to maintain inappropriately high staffing levels and continue pouring money into marketing efforts even as the business steeply declined. This reckless spending benefitted AR Capital, which enjoyed all of the upside of moving more product and increasing its income from assets under management while off-loading 75% of the costs onto RCAP's public shareholders.").

[188] *See London*, 2008 WL 2505435, at *5 (noting that when a director stands on both sides of a transaction, "the plaintiff need not show that the director received some sort of material benefit" in order for him to be deemed interested in the transaction).

[189] *See, e.g.*, *Globis Partners, L.P. v. Plumtree Software, Inc.*, 2007 WL 4292024, at *5 (Del. Ch. Nov. 30, 2007) ("A director is considered interested when he will receive a personal financial benefit from a transaction that is not equally shared by the stockholders . . . ." (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984))).

[190] *Orman*, 794 A.2d at 23.

made it improbable that [she] could perform her fiduciary duties to the . . . shareholders without being influenced by her overriding personal interest."[191] The Plaintiff does not dispute that, to show a disabling interest, it must adequately allege that each of the challenged decisions conferred a material benefit on the Control Defendants.[192]

The Plaintiff's attack on these allegedly interested acquisitions and staffing decisions suffers from a fatal flaw. The Complaint lacks any facts suggesting that the benefits these decisions provided to the Control Defendants were material to them. For starters, there are no specific allegations about the Control Defendants' economic circumstances, though the Complaint does say that these individuals are "immensely wealthy."[193] Without more concrete information about the Control Defendants' financial circumstances, I cannot determine whether the benefits they

---

[191] *In re Gen. Motors Class H S'holders Litig.*, 734 A.2d 611, 617 (Del. Ch. 1999); *accord Orman*, 794 A.2d at 25 n.50 (stating that the benefit alleged to have created a disabling interest must be "of such subjective material significance to th[e] particular director that it is reasonable to question whether that director objectively considered the advisability of the challenged transaction to the corporation and its shareholders").

[192] *See* Sept. 29, 2017 Oral Arg. Tr. 50:4–7, 50:9–12 ("MR. HOROWITZ: But I would think implicit in [*Aronson*'s description of the standard for establishing a disabling interest] is Your Honor has to find it reasonably conceivable that that non-pro rata benefit was sufficient to have a material impact on the defendants' decision-making. . . . I say that, Your Honor, because I'm confident that we've alleged sufficient facts with regard to each of these transactions to satisfy that standard.").

[193] Compl. ¶ 2.

purportedly received from the challenged decisions were so important to them that their impartiality was compromised.[194]

The Plaintiff also fails to make any attempt to quantify the financial benefits conferred by the challenged decisions. The Control Defendants caused RCAP to acquire Snyder Kearney in an attempt "to defang a critic of AR Capital products."[195] I am left to speculate, however, about the economic impact of Snyder Kearney's criticism on AR Capital's business. Equally speculative is the financial benefit to AR Capital from RCAP's acquisition of Docupace, which produced "back-office software for broker-dealers."[196] According to the Plaintiff, that software was important to AR Capital because it would enable retail broker-dealers to more effectively sell AR Capital's investment products. Again, however, there are no specific allegations about the actual or expected economic impact of the Docupace acquisition on AR Capital.[197] The same gap exists in the allegations about the

---

[194] *See, e.g.*, *LC Capital Master Fund, Ltd. v. James*, 990 A.2d 435, 453 (Del. Ch. 2010) ("[$500,000] would be material to most Americans. But most Americans are not corporate directors, and do not have a $5.6 million stake of common stock in any company. And, the plaintiffs have not advanced any reason to believe that the hypothetical 10% shift [in merger consideration to the preferred] would be important to Jurika. The man could be as rich as Croesus or Jimmy Buffett. The plaintiffs have a burden here and they have not even tried to meet it."); *cf. Chester Cty. Emps.' Ret. Fund v. New Residential Inv. Corp.*, 2017 WL 4461131, at *8–9 (Del. Ch. Oct. 6, 2017) (refusing to find that two directors' receipt of director fees was material to them simply because one was retired and the other was "not wealthy").

[195] Compl. ¶ 95.

[196] *Id.* ¶ 102.

[197] The Complaint alleges that, as part of the acquisition of Docupace, "AR Capital was guaranteed access to Docupace's products and services." *Id.* ¶ 106. But the Complaint does not specify the economic benefit AR Capital received from that access.

supposedly irrational staffing decisions at RCS. The Complaint alleges that having so many employees at RCS "made sense only for AR Capital, which bore none of the costs but benefitted from having available the maximum capacity to push product."[198] But the Plaintiff provides no details that allow me to quantify any benefit to AR Capital from having additional staff members at RCS push AR Capital product. That prevents me from evaluating the materiality of such benefits to the Control Defendants. Finally, RCAP's acquisition of Strat Cap, a wholesaler of non-traded investment vehicles, was allegedly designed to reduce competition with AR Capital and provide "access to national, full-service broker-dealers, known colloquially as 'wire houses.'"[199] But, for reasons I have already explained, I cannot determine whether those benefits materially affected the Control Defendants' ability to bring their business judgment to bear on the acquisition.[200]

By creating and using super-voting stock to maintain control over RCAP despite holding only a minority interest, the Control Defendants put themselves in a position where their decisions as fiduciaries to RCAP invite suspicion. Nonetheless, I must dismiss those causes of action where the Defendants do not appear on both sides of the transaction. As I have explained, to survive a motion to dismiss in these

---

[198] *Id.* ¶ 64.

[199] *Id.* ¶ 90.

[200] As with the Docupace acquisition, the Strat Cap deal included a requirement that Strat Cap "distribute AR Capital products on the same abusive terms the[ Control Defendants] were already imposing on [RCS]." *Id.* ¶ 92. Yet the Plaintiff fails to offer any specifics about the scale of this distribution and its economic effect on AR Capital.

44

circumstances, based on allegations that the Control Defendants received an ancillary benefit not shared by all stockholders, requires pleading that the benefit so received was sufficiently material to overcome fiduciary duties. Otherwise, *every* business decision taken by the Control Defendants would be subject to entire fairness review. That is not our law. The Plaintiff has failed to allege facts suggesting that the Control Defendants had a disabling interest in any of the challenged acquisitions or the decision to overstaff RCS. These decisions therefore receive the protection of the business judgment rule, and any fiduciary duty claim premised on them is dismissed.[201]

### D. Quarto and Holdings

The Defendants ask me to dismiss Louisa Quarto from this action. Quarto served as RCS's president from January 2012 through January 2016; she was also an Executive Vice President at AR Capital during that time. The Complaint alleges that in October 2013, when the Control Defendants were contemplating the Strat Cap acquisition, an RCS employee sent Quarto and Edward Weil "an overview of Strat Cap's business."[202] The overview revealed that, unlike RCAP, Strat Cap

---

[201] *See Solomon v. Armstrong*, 747 A.2d 1098, 1118 (Del. Ch. 1999) ("[I]t is well established that when a party challenges a director's action based on a claim of the director's debilitating pecuniary self-interest, that party must allege that the director's interest is material to that director. This simple statement of the law was pointed out by defendants during oral argument (and in their briefs), yet plaintiffs persist in failing to allege materiality or even to meet the argument. Consequently, these allegations fail to rebut the business judgment standard of review." (footnote omitted)).

[202] Compl. ¶ 55.

"received between 20% and 25% of the ongoing management economics" from the REITs it distributed "in addition to the standard (legally constrained) 3% dealer-manager fees."[203] That information, however, "*was excluded* from the single slide deck provided to the RCAP Board of Directors to obtain their written consent to the Strat Cap acquisition on October 23, 2013."[204] These allegations fail to support an inference that Quarto breached her fiduciary duties. Indeed, the Plaintiff does not even say who removed this information from the slide deck, or whether Quarto was actually involved in the preparation of the slides.

The Complaint also alleges that Quarto knew RCS "had far more salespeople than [its] nearest competitors."[205] The Plaintiff fails to explain how that knowledge suggests disloyal conduct on Quarto's part; indeed, one would expect RCS's President to know such things. The Complaint further asserts that Quarto "affirmatively hid" from RCAP's independent directors information about the off-market nature of the arrangements between RCAP and AR Capital.[206] But that allegation is conclusory, and is too vague to support an inference that Quarto breached any duty owed to RCAP or RCS. The Plaintiff attempts to support the concealment allegation by pointing to the incident with the slide deck, but as I just

[203] *Id.*
[204] *Id.* (emphasis added).
[205] *Id.* ¶ 65.
[206] *Id.* ¶ 54.

46

noted, the Complaint does not allege that Quarto actually removed the relevant information from the slides. Finally, the Plaintiff cannot premise any fiduciary duty claim against Quarto on her conduct during the negotiations with Phillips Edison over the restructuring of the deal between the AR Capital advisor subsidiaries and the Phillips Edison REITs. While the Complaint alleges that Quarto fought for AR Capital's interests during those negotiations, there is no reason think such behavior was disloyal to RCS. After all, the arrangements at issue were between AR Capital entities and Phillips Edison, and neither RCAP nor RCS was involved in them in any way.[207] That Quarto participated in wrongdoing is, like any malign behavior on the part of mankind, conceivable; the Plaintiff fails to plead facts that make it reasonably conceivable, however. Since the Complaint fails to adequately allege that Quarto breached her fiduciary duties, or that she aided and abetted such breaches by others,[208] she must be dismissed from this action.

The Defendants also argue that Holdings should be dismissed from this case. Holdings is a Delaware limited liability company whose primary asset was the

---

[207] When asked at oral argument to explain what Quarto's fiduciary duties required her to do during those negotiations, counsel for the Plaintiff conceded that "there was nothing she could have done because the horse had already left the barn." Sept. 29, 2017 Oral Arg. Tr. 77:6–12.

[208] *See In re Dole Food Co., Inc. S'holder Litig.*, 2015 WL 5052214, at *41 (Del. Ch. Aug. 27, 2015) (noting that an aiding and abetting claim "has four elements: (i) the existence of a fiduciary relationship, (ii) a breach of the fiduciary's duty, (iii) knowing participation in the breach, and (iv) damages proximately caused by the breach," and emphasizing that "the element of 'knowing participation' requires that the secondary actor have provided 'substantial assistance' to the primary violator'").

47

RCAP B share that enabled the Control Defendants to exercise control over RCAP. The Plaintiff suggests that "Holdings is properly included as a defendant because it was the instrumentality through which the Control Defendants exercised dominion over RCAP."[209]  In support of this argument, the Plaintiff cites *In re Ezcorp Inc. Consulting Agreement Derivative Litigation*, in which Vice Chancellor Laster held that a plaintiff could bring fiduciary duty and abetting and abetting claims against the entities through which a controlling stockholder exercised control over a corporation he allegedly looted.[210]  I agree with the Plaintiff that *Ezcorp* controls here.  The Control Defendants' alleged scheme to enrich themselves depended on maintaining voting control over RCAP despite their 25% economic stake.  They exercised that control through Holdings, whose main asset was the RCAP B share that conferred majority voting power.  In other words, Holdings was "the vehicle[] through which [the Control Defendants] controlled [RCAP]."[211]  Thus, I decline to dismiss Holdings from this action.[212]

---

[209] Pl.'s Answering Br. 36.

[210] 2016 WL 301245, at *10–11, 31.

[211] *Id.* at *10.

[212] The Defendants argue that the relevant holdings in *Ezcorp* were "reversed on reconsideration by the same court one month later."  ARC Parties Reply Br. 33 n.14.  Not quite.  The Court did not disturb its ruling that the plaintiff stated an aiding and abetting claim against the entities through which the controlling stockholder allegedly looted the corporation he controlled.  *In re Ezcorp Inc. Consulting Agreement Derivative Litig.*, 2016 WL 727771, at *1–2.  True, the Court narrowed the scope of the fiduciary duty count by holding that it did not encompass a claim against the entities through which control was exercised.  *Id.* at *1.  But that decision did not rest on the Court's recognition that it had misapplied the legal standard for holding such entities liable for breaches of fiduciary duty.  Instead, the issue was whether the Court had "misapplied the operative pleading standards in an unprecedented way that violated [the controlling stockholder's]

48

*E. Unjust Enrichment and Aiding and Abetting*

The Plaintiff brings a claim for unjust enrichment against AR Capital, AR Global, and the Advisor Defendants, along with a claim for aiding and abetting against Holdings and the Control Defendants.[213]  Unjust enrichment, I note, invokes an equitable remedy of disgorgement that involves issues of fact.  Because the core fiduciary duty claim survives the Defendants' Motions to Dismiss, I find it prudent to reserve decision on the arguments for dismissing the unjust enrichment and aiding and abetting claims, pending supplemental briefing, should any party desire it, on the viability of these claims in light of this Memorandum Opinion.

### III. CONCLUSION

For the foregoing reasons, the Defendants' Motions to Dismiss are granted in part, denied in part, and reserved in part.  The parties should submit an appropriate form of order.

---

constitutional right to due process by depriving him of an unbiased decision-maker."  *Id.* Specifically, the controlling stockholder argued that it was improper for the Court to find that the complaint stated a breach of fiduciary duty claim against the entities in question when "the plaintiffs technically did not sue [them]."  2016 WL 301245, at \*11.  In any event, while the Court agreed to narrow the scope of the fiduciary duty count, it also granted leave to amend precisely because the complaint alleged facts that stated a claim against the entities through which the corporation was purportedly looted.  2016 WL 727771, at \*1.

[213] The Complaint also names Quarto in the aiding and abetting count, but I have already held that she must be dismissed from this action.

49